# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL J. SCOTT, | |
| Plaintiff, | |
| v. | CAUSE NO.: 1:18-CV-178-HAB |
| ANDREW SAUL, Acting Commissioner of Social Security, | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff Michael J. Scott seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits and Supplemental Security Income. Plaintiff alleges that he has been disabled since January 3, 2013, due to a variety of physical and mental impairments, including syringomyelia, tremors of the arms and legs, imbalance, headaches, neck-aches, and blurry vision. He argues that the ALJ erred by failing to properly weigh the medical opinion evidence and incorporate all of Plaintiff's limitations in the residual functional capacity finding, failing to properly evaluate the symptom testimony and to consider Plaintiff's impairments in combination, and failing to incorporate all of the Plaintiff's limitations in the hypothetical to the vocational expert and to evaluate the demands of the past work "as generally performed in the national economy."

The Commissioner defends its decision, stating that substantial evidence of record supports the decision of the Administrative Law Judge (ALJ) that Plaintiff could perform his past relevant work.

## PROCEDURAL BACKGROUND

In February 2013, Plaintiff filed an application for Disability Insurance Benefits, and in March 2013 he filed an application for Supplemental Security Income. After an ALJ concluded on March 13, 2015, that Plaintiff was not disabled, and the Appeals Council denied his request for review, Plaintiff filed a civil action pursuant to 42 U.S.C. § 405(g). The parties agreed to reversal and remand for a new hearing and decision. On remand, the Appeals Council specifically directed the ALJ to consider the opinion from Dr. Lentz, dated March 23, 2015. The ALJ was to also give further consider to Plaintiff's residual functional capacity and, if necessary, obtain supplemental evidence from a vocational expert.

ALJ Stephanie Katich conducted a new hearing on April 12, 2017. Plaintiff appeared and testified, as did a vocational expert. On June 1, 2017, ALJ Katich issued a decision (the Decision) finding that Plaintiff was not disabled as defined in the Social Security Act. Upon Plaintiff's written exceptions with the Appeals Council regarding the Decision, the Appeals Council found no reason to assume jurisdiction thereby rendering the June 1, 2017, Decision the final decision of the Commissioner. Thereafter, Plaintiff initiated this appeal.

## ANALYSIS

### A. The ALJ's Decision

A person suffering from a disability that renders him unable to work may apply to the Social Security Administration for disability benefits. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, a claimant must demonstrate that his physical or mental

limitations prevent her from doing not only his previous work, but also any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. § 423(d)(2)(A); § 1382c(a)(3)(B).

If a claimant's application is denied initially and on reconsideration, he may request a hearing before an ALJ. *See* 42 U.S.C. § 405(b)(1). An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he has the residual functional capacity to perform his past relevant work, and, if not (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a)[1]; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

Here, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity (SGA) since January 3, 2013, the alleged onset date. (R. 490.) At step two, the ALJ found that Plaintiff had the severe impairments of syringomyelia (i.e., benign tumor on the cervical spine), peripheral neuropathy, and obesity. The ALJ stated that these conditions resulted in more than mild limitations in functioning and were, therefore, severe.

Evidence related to tension headaches, obstructive sleep apnea, hypertension, benign hypogonadism, paroxysmal atrial fibrillation, and diverticulosis were not found to be severe. Rather, the conditions largely occurred in acute episodes or resulted in non-severe symptoms and dysfunction, with severity not enduring for twelve months. (R. 491.)

---

[1] As discussed in *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003), the Act and implementing regulations regarding DIB (contained in Title II of the Act and 20 C.F.R. Pt. 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Pt. 416 of the regulations) are, for the most part, substantially identical. For convenience, the Court will generally cite herein to only the Title II statutes and regulations.

The ALJ also discussed Plaintiff's depression and anxiety, as well as his issues with memory and cognition. The ALJ considered the opinions of State Agency psychologists, the results of neuropsychological evaluations, and medical records from Plaintiff's family physician. (R. 491–94.) She concluded that the medical evidence "largely demonstrate[d] minimal to unremarkable clinical findings, minimal need for treatment, and improvement with treatment." (R. 493.) This, "along with claimant's demonstrated involvement in a wide range of daily activities, . . . does not suggest a severe mental impairment." Accordingly, "[t]he claimant's medically determinable mental impairments of anxiety disorder and cognitive disorder, not otherwise specified, considered singly or in combination, do not cause more than a minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (R. 494–95.)

Before moving to step four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with additional limitations. These limitations included occasional balancing, stooping, kneeling, crouching, and crawling and climbing of ramps or stairs. Plaintiff could never climb ladders, ropes, or scaffolds. Plaintiff also had to avoid concentrated exposure to unprotected heights, dangerous moving machinery, and slippery, wet, or uneven surfaces. (R. 495.)

Based on the above RFC and her hypothetical questions to the vocational expert, the ALJ found that Plaintiff could perform his past relevant work as a commercial sales estimator and manufacturer's representative. These were skilled jobs, performed at the sedentary and light

4

exertional levels respectively. Thus, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (R. 501–02.)

**B.      Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007).

In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). However, review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). A reviewing court will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to [the] conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure" the court that he "considered the

important evidence" and to enable the court "to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotation marks omitted)).

**C.     Opinion of Dr. Lentz**

Plaintiff argues that the ALJ improperly failed to give controlling weight to the opinions of his family physician, Dr. Lentz, and failed to specify how much weight she afforded the opinions.

Agency regulations address the evaluation of opinion evidence for claims filed before March 27, 2017, in 20 C.F.R. § 404.1527. The regulations provide that, regardless of its source, an adjudicator will evaluate every medical opinion that she receives. 20 C.F.R. § 404.1527(c). An adjudicator is required to provide good reasons for the weight given to a treating source's opinion and will give a treating source's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). When an adjudicator does not give a treating source's opinion controlling weight, the adjudicator decides what weight to give the opinion, as well as any other medical opinions, by considering the following factors: (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the medical practitioner's area of medical specialty; and (6) other factors brought to the adjudicator's attention that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1527(c)(1)–(6).

In her Decision, the ALJ address the opinions of Dr. Lentz dated March 23, 2015, and March 20, 2017. The ALJ noted that the 2015 opinion indicated that Plaintiff's condition was

painful, Plaintiff volunteered 12 to 15 hours a week, that he could not engage in greater work-like activity, and that Plaintiff reported he reclined 4 to 5 hours a day. Addressing the 2017 opinion, the ALJ stated that Dr. Lentz noted Plaintiff's inability to sustain even low stress work, that Plaintiff would be absent more than four days per month, that Plaintiff could not engage in sitting, walking and/or standing for an eight-hour workday "along with all manner of additional limitations in the use of the hand with muscle weakness, dropping items, muscle spasm and reduced grip strength." (R. 499.)

After citing to Dr. Lentz's opinions, the ALJ stated that "it is unclear upon what evidence Dr. Lentz relied in suggesting extreme limitations. His own treatment notes do not document this degree of limitation due to muscle spasm, weakness of muscles/grip strength, or other conditions that could reasonably provide a rationale for this level of deficit in functioning." (*Id.*) According to the ALJ's Decision, Dr. Lentz's office visit notes from October 2013 and May 2016 "showed some upper right extremity weakness with slight tremors, but also a normal gait/station, no neurological deficits and no mental status deficits." (R. 500.) Additionally, Plaintiff reported minimal pain on April 2014 and on review of symptoms, but he "more often than not denied arm/hand/leg weakness with no numbness or tingling and good coordination and anxiety/depression." (*Id.*) The ALJ then cited to "the actual clinical findings of no less than five consultative neurosurgeons" that she believed stood in contrast to Dr. Lentz's notes and opinions.

Plaintiff argues that the ALJ's characterization of the findings of the neurosurgeons as "unremarkable" and contradictory of Dr. Lentz's opinion is not supported by the evidence. Additionally, he notes that Dr. Lentz also treated Plaintiff's depression and anxiety and referred him for neuropsychological evaluation. Thus, Dr. Lentz was aware of the comorbidity of Plaintiff's physical and psychiatric impairments. According to Plaintiff, Dr. Lentz was the only physician

who rendered an opinion that took into account Plaintiff's physical and mental conditions in combination.

Plaintiff asserts that the only medical opinions contrary to the Dr. Lentz's opinions were the 2013 opinions from the non-examining state agency medical consultants. However, those consultants never evaluated or treated Plaintiff, and did not have access to the more complete, updated medical evidence. Thus, Dr. Lentz was also the only acceptable medical source who provided a medical opinion based on the updated medical evidence, including updated MRIs and mental evaluations subsequent to the state agency review.

Finally, Plaintiff contends that, with respect to some of the limitations that Dr. Lentz reported, there are no contrary medical opinions. The state agency medical consultants' residual functional capacity form does not address multiple significant areas, particularly concerning Plaintiff's limitations regarding the movement of the cervical spine. The state agency medical consultants also did not address "off task" behavior or anticipated absences.

The Court begins with a review of Dr. Lentz's opinions. In March 23, 2015, Dr. Lentz wrote a letter indicating that Plaintiff had been his patient for about ten years, and explaining that Plaintiff had syringomyelia (benign tumor on the cervical spine), which consulting neurosurgeons and neurologists agreed was non-operable. Dr. Lentz opined that the condition limited Plaintiff's abilities to sustain exertional activities in which he employed his cervical spine and cervical paraspinal muscles. The condition was also acutely painful at times, which still permitted Plaintiff to volunteer in an office twelve to fifteen hours per week. Plaintiff would, however, have to recline for the remainder of a day after working four to five hours. Dr. Lentz explained that in addition to the pain from a physical standpoint, the condition had taken a toll on Plaintiff's mental health,

particularly the knowledge that the tumor could take his life. Dr. Lentz advised that working beyond fourteen to fifteen hours per week could be detrimental to Plaintiff's health.

In March 2017, Dr. Lentz provided a medical opinion regarding Plaintiff's impairments and work-related abilities. Dr. Lentz stated that numbness and tingling in Plaintiff's upper and lower extremities was always present. Dr. Lentz identified the associated symptoms as muscle spasm, muscle weakness, lack of coordination, reduced grip strength, dropping things, impaired sleep, abnormal posture, vertigo, and eye pain. Dr. Lentz stated that Plaintiff had an unsteady gait, and that activities of living caused pain, numbness, and headaches. Additionally, Plaintiff had a limited cervical range of motion. Dr. Lentz advised that anxiety and depression impacted Plaintiff's physical condition and functional limitations.

In a competitive, eight-hour working day, Dr. Lentz opined that Plaintiff could sit for about two hours and stand/walk for two hours. He would take unscheduled breaks to lie down for up to one hour in length every one to two hours. Plaintiff's lifting would be limited to ten pounds, and then only rarely could he lift that amount. Activities of reaching, handling, or fingering and activities involving the neck were severely restricted. Plaintiff could not twist or crouch. Dr. Lentz opined that Plaintiff would be off task more than 25% of the workday, would be absent for more than four days a month, and was incapable of tolerating even low stress.

As stated above, a treating source's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Here, the ALJ determined that neither Dr. Lentz's own treatment notes, nor the findings of consulting neurosurgeons supported such extreme limitations.

In making this determination, the ALJ's focus was on the lack of neurological deficits, Plaintiff's overall stable gait, and his retained motor strength. She also noted that Plaintiff was found to have no more than mild limitations in any single area of mental functioning at Step Two, which had no functional equivalent in his RFC. The Court finds that this gloss on the impact of Plaintiff's mental impairments appears to have impacted the weight that the ALJ assigned to Dr. Lentz's opinions. However, as Plaintiff notes, Dr. Lentz was the only source who offered an opinion that considered Plaintiff's physical and mental conditions in combination. That is, while the neurologists were looking at one aspect of Plaintiffs' condition, and the mental health providers were looking at another, Dr. Lentz contemplated the impact of all Plaintiff's conditions, including those that were not considered severe when viewed singly. Dr. Lentz was also aware of Plaintiff's history of sleep apnea. Plaintiff had been diagnosed in 2011 with mild sleep obstructive sleep apnea with intermittent hypoxemia and atrial fibrillation on and off. However, because the CPAP headgear was compressing the spinal cord area and was severely uncomfortable, he stopped using it in 2013. In 2016, Plaintiff reported that his spinal cord cyst occasionally caused pain and affected his sleep. He also reported that he was having early morning headaches that may be associated with his cyst. Given the combination of Plaintiff's impairments, the ALJ's heavy reliance on the neurologists' consultations does not adequately address whether Dr. Lentz's opinion was well supported by the objective medical evidence and not inconsistent with other substantial evidence in the record.

Moreover, by lumping Dr. Lentz's statements together, the ALJ's Decision leaves untouched portions of his multi-faceted opinion. For example, although the Decision addresses the objective evidence related to upper extremity weakness and gait, it does not address Dr. Lentz's opinion regarding the time off task, absences per month, or ability to handle stress. Thus, even if

some of the restrictions Dr. Lentz cited were inconsistent with substantial evidence in the record, it is not clear from the Decision that other portions of the opinion—addressing entirely different restrictions—did not warrant some weight.

The ALJ's approach was further exacerbated by selecting only portions of the record that supported her ultimate findings. For example, the ALJ pointed out that Plaintiff specifically denied dropping things in a March 2017 exam with Dr. Canavati (Ex. 36F), but Plaintiff testified that he was not asked about dropping things, that he loses dexterity in the fingers of his right hand and it gets weak and he drops things pretty regularly. (R. 527-30.) Plaintiff reported that the neuropathy, numbness, and pain were related to the moving of his head back and forth. (R. 529.) The Decision fails to address the contrary evidence in the May 2015 exam by Dr. Jacobsen: Plaintiff noted dropping things, having difficulty using his hands to button shirts or cut up meat, and significantly worsened handwriting. Additionally, in the examination with Dr. Canavati where it was noted that Plaintiff did not drop things, it was also noted that Plaintiff had a longstanding history of neck pain, numbness in the hands, intermittent dizziness, and trouble focusing. Dr. Canvati also noted that Plaintiff was frustrated by the fact that he was not able to do things he did in the past and felt limited because of the pain and dysesthesia. (R. 969.) Yet, when the ALJ found that Plaintiff's testimony about his symptoms was less consistent with the overall evidence than was the opinion of the state agency consultants, in part, because "[f]ew notes in the record support claims of significant . . . pain. To the contrary, as noted by several examining neurologists, the spinal cyst(s) does not appear to be causing symptoms sufficient to warrant surgery." (R. 501.) The full import of Dr. Canvati's impression was quite different:

> I had a lengthy discussion with Mr. Scott. Basically he is concerned about limitation of his activities of daily living and the pain. I told him any surgical intervention more likely than not will cause neurological deficit, increased pain and numbness and possible gait disturbance and in rare circumstances he may even have paralysis. The other option would be observation. This tumor has not progressed over the last five years and one option would be continued observation which I would favor. Any surgical intervention is not likely to reverse his current symptoms and if anything it will add to his neurological deficit. He was told the same thing by Dr. Rudy Kachmann and Dr. Walter Jacobsen and also by Dr. Edward Benzel at the Cleveland Clinic and Dr. Scott Shapiro at Goodman Campbell.

(R. 970.)

Accordingly, the recommendation to avoid surgical intervention was not due to lack of symptoms. It was the best option where the potential outcome of surgery would be a worsening of his symptoms or even paralysis, particularly where his symptoms had been essentially the same over the last five years.

There are other examples where the ALJ's Decision does not assist in providing a logical bridge for rejecting Dr. Lentz's opinion or Plaintiff's description of his limitations. For example, the ALJ cites to Exhibit 31F of the record, mostly to indicate that it does not support more than mild limitations in mental functioning. Exhibit 31F is the neuropsychological consultative notes of Jacob Lutz, Ph.D, H.S.P.P. Dr. Lentz referred Plaintiff for consultation due to concerns regarding memory and cognition. After the May 2015 consultation, Dr. Lutz stated that he believed there was a "strong psychological component to Mr. Scott's current difficulties." (R. 940 (describing a "pronounced level of depression and possibly some level of anxiety").) Dr. Lutz thought that Plaintiff's diagnosis, along with his wife's diagnosis of terminal cancer, coupled with stress, was likely playing a significant role in the cognitive symptoms Plaintiff was describing. Plaintiff's sleep apnea could also be a factor. Dr. Lutz planned to have Plaintiff return for testing. Plaintiff did not have testing, stating that it was cost prohibitive with his insurance coverage.

When he saw Dr. Lutz again about a year later, he was still having difficulty focusing.

12

He was also struggling with the passing of his wife, which included suicidal ideation. He became tearful several times a day, his sleep was fitful, he worried excessively, and he had difficulty starting projects. Dr. Lutz thought Plaintiff would benefit from antidepressant medication. In the past, Lexapro made Plaintiff feel worse. Dr. Lutz believed he was experiencing classic symptoms of depression, which was understandable in the context of the loss of his wife. Dr. Lutz also recommended that Plaintiff follow up with his sleep specialist, as sleep apnea could very well explain a lot of his attention and concentration issues and be contributing to his depression. Plaintiff had not been in treatment because the spinal condition caused him to not tolerate the mask.

In July 2016, Plaintiff returned for updated treatment recommendations. Plaintiff reported that he had tried Cymbalta, but that it made him feel lethargic, cloudy, and aggressive. He went to Parkview Behavior Health, but he denied inpatient treatment. He was referred for counseling, which he attended. He was also still attending grief counseling. Plaintiff was struggling with suicidal thoughts. He volunteered with a church ministry. Dr. Lutz advised that taking an antidepressant would benefit Plaintiff, but that there could be quite a bit of trial and error with the process. Plaintiff did not want to try at that time. Dr. Lutz continued to recommend follow-up with sleep, if Plaintiff had not already done so.

The ALJ's Decision does not adequately confront this evidence, explaining how it was inconsistent with Dr. Lentz's opinion. Moreover, to the extent the ALJ considered the State agency psychological consultants' opinion, as well as the later evidence, the ALJ's assessment was improper. The State Agency psychologists offered their opinions in 2013. They did not review the records from 2015 and 2016. Instead, the ALJ assessed these neuropsychological consultative notes without input from an expert. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) as amended on reh'g (Apr. 13, 2018) (reiterating the rule that "[a]n ALJ should not rely on an outdated

assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion"); *see also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny). The 2013 opinions reference anxiety-related disorders, but there is no mention of depression. The clinical notes thus "reveal significant and new developments in [Plaintiff's] mental health that could have affected [the prior] assessment." *Moreno*, 882 F.3d at 728.

The ALJ's assessment of Dr. Lentz's opinions and of Plaintiff's own statements significantly impacted the RFC. Based on its review of the record, the Court finds that the ALJ should be afforded another opportunity to build an accurate and logical bridge from the evidence to the RFC conclusion.

## CONCLUSION

For the reasons set forth above, the Defendants' Decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

SO ORDERED on March 19, 2020.

                                         s/ *Holly A. Brady*
                                         JUDGE HOLLY A. BRADY
                                         UNITED STATES DISTRICT COURT